NO. 24-1216

In the United States Court of Appeals
For the Fourth Circuit

JUSTYNA JENSEN,
*Plaintiff-Appellant,*

v.

MARYLAND CANNABIS ADMINISTRATION and WILLIAM
TILBURG, in his official capacity,
*Defendants-Appellees.*

On appeal from an Order of the United States District Court for the
District of Maryland

**OPENING BRIEF OF APPELLANT**

Jeffrey M. Jensen
JEFFREY M. JENSEN, PC
9903 Santa Monica Blvd. #890
Beverly Hills, CA 90212
Tel: (310) 909-7043
jeff@jensen2.com
*Counsel for Plaintiff-Appellant*

1

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................7

JURISDICTIONAL STATEMENT ......................................................13

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................13

STATEMENT OF THE CASE...............................................................13

      A.    The Application Program Favors Maryland Residents.......................13

      B.    Ms. Jensen Satisfies All Application Requirements Except
Appellees' Unconstitutional Maryland Residency Preference ..........16

      C.    Ms. Jensen Promptly Warned Appellees of the Constitutional
Violation and The Brought Suit ..........................................................17

      D.    The District Court Denied the Preliminary Injunction.......................18

      E.    Procedural History...............................................................................19

SUMMARY OF THE ARGUMENT ......................................................19

STANDARD OF REVIEW ....................................................................21

ARGUMENT ..........................................................................................22

I.    Preliminary Injunction Legal Standard ........................................22

II.    The District Court Erred in Concluding Ms. Jensen Did Not Show a
Likelihood of Success on the Merits ..............................................22

      A.    First Circuit...........................................................................................23

      B.    Seventh Circuit .....................................................................................40

      C.    District Court Injunctions......................................................................42

D.    Minority Jurisdiction ..........................................................44

E.    Scope of Relief ...................................................................47

III.   The District Court Correctly Found Ms. Jensen Showed Irreparable Harm ......................................................................................49

IV.   The District Court Erred in Finding the Balance of Equities and the Public Interest Favor Appellees ...................................................54

A.    No Delay...............................................................................56

B.    Interstate Activity ...............................................................60

C.    Other Public Interests .........................................................61

D.    Equitable Powers .................................................................64

V.    The Court Should Order an Injunction Forthwith with No Injunction Bond .........................................................................................64

CONCLUSION .......................................................................................65

CERTIFICATE OF COMPLIANCE.....................................................66

CERTIFICATE OF SERVICE ..............................................................67

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020) .............22

*AZ H.B. 2770 (2024)* ..................................................................................................40

*Baldwin v. G.A.F. Seelig, Inc*., 294 U.S. 511 (1935)..............................................38

*BioPure Healing Prod*., LLC v. WellNX Life Scis., Inc., No. C17-470-RSL, 2017 WL 4168279 (W.D. Wash. Sept. 20, 2017).........................................................65

*Brinkmeyer v. Washington State Liquor & Cannabis Bd.*, No. C20-5661 BHS, 2023 WL 1798173 (W.D. Wash. Feb. 7, 2023)....................................................44

*C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383 (1994)..............39

Cal. Bus. & Prof. Code § 26301 ................................................................................40

*California v. Zook*, 336 U.S. 725 (1949) ........................................................... 25, 26

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564 (1997) ....................................................................................................................................39

*Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184 (4th Cir. 2013)....................55

*City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978).......................................40

*Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156 (2d Cir. 2004) ........................65

*Eisenberg ex rel. Eisenberg v. Montgomery Cnty. Pub. Sch.*, 197 F.3d 123 (4th Cir. 1999) ............................................................................................................64

*Finch v. Treto*, 82 F.4th 572 (7th Cir. 2023) ...........................................................40

*Finch v. Treto*, No. 22 C 1508, 2022 WL 2073572 (N.D. Ill. June 9, 2022) .. 41, 51, 52

*Gen. Motors Corp. v. Tracy*, 519 U.S. 278 (1997)..................................................34

*Gibbons v. Ogden*, 22 U.S. 1 (1824).........................................................................40

*Gonzales v. Raich*, 545 U.S. 1 (2005).......................................................................24

*GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199 (9th Cir. 2000) ......................65

*Granholm v. Heald*, 544 U.S. 460 (2005)................................................................37

*Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630 (7th Cir. 2005).............53

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411 (4th Cir. 1999) ........64

*Hughes v. Oklahoma*, 441 U.S. 322 (1979)..............................................................39

*inter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .........................................22

*JTH Tax LLC v. Kukla*, No. 22-cv-01542, 2022 WL 1651074 (E.D.N.Y. Apr. 26, 2022) ......................................................................................................................65

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330 (4th Cir. 2021) ......................................................................................................................21

*Leaders of a Beautiful Struggle*, 2 F.4th at 346 ......................................................54

*Libertarian Party of Connecticut v. Merrill*, No. 15-CV-1851 (JCH), 2016 WL 10405920 (D. Conn. Jan. 26, 2016) ....................................................................65

*Lowe v. City of Detroit*, 544 F. Supp. 3d 804 (E.D. Mich. 2021)............................43

*Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 816 (E.D. Mich. 2021)....................52

*Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir. 1984)....................................................62

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197 (4th Cir. 2019) ................................................................50

*Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 737 F.3d 273 (4th Cir. 2013) ......................................................................................................................23

*New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020) ...54

*Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956 (9th Cir. 2015) ................45

*Northeast Patients Group. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542 (1st Cir. 2022)...............................................................................23

*NPG, LLC v. City of Portland, Maine*, No. 2:20-CV-00208-NT, 2020 WL 4741913 (D. Me. Aug. 14, 2020)............................................................................ 32, 43

*Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374 (9th Cir. 1985) ................59

OR S.B. 582 (2019)..................................................................................................40

*Original Investments, LLC v. Oklahoma*, 542 F. Supp. 3d 1230 (W.D. Okla. 2021) ......................................................................................................................64

*Original Investments, LLC v. State of Oklahoma*, 542 F. Supp. 3d 1230 (W.D. Okla. 2021)....................................................................................................45

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)..........................50

*Peridot Tree WA Inc. v. Washington State Liquor & Cannabis Control Bd.*, No. 3:23-CV-06111-TMC, 2024 WL 69733 (W.D. Wash. Jan. 5, 2024).......... 44, 59

*Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865 (7th Cir. 2009) ....................................................................................................................54

*Prudential Ins. Co. v. Benjamin*, 328 U.S. 408 (1946)..................................... 27, 33

*Quezada v. BP Prods. N. Am., Inc.*, No. 06 CV 5378 (SJ), 2006 WL 3837720 (E.D.N.Y. Dec. 1, 2006) ....................................................................................53

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597 (9th Cir. 1991) ............................................................................................................53

Rev. Code WA § 43.06.495 .....................................................................................40

*S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82 (1984)..................................33

*Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941 (1982)..................................33

*Starlight Sugar, Inc. v. Soto*, 114 F.3d 330 (1st Cir. 1997) ....................................53

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001)...53

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504 (2019)..........37

*Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747 (1986).21

*Toigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985 (W.D. Mo. 2021) 43

*United States v. Heyward*, 42 F.4th 460 (4th Cir. 2022) .........................................23

*United States v. Thomas*, 939 F.3d 1121 (10th Cir. 2019) ...................................23

*Variscite NY Four, LLC v. New York State Cannabis Control Bd.*, No. 123CV01599AMNCFH, 2024 WL 406490 (N.D.N.Y. Feb. 2, 2024) ......... 45, 59

*Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232 (N.D.N.Y. 2022) ..........59

*Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232 (N.D.N.Y. 2022), reconsideration denied, No. 122CV1013GLSDJS, 2023 WL 1420662 (N.D.N.Y. Jan. 31, 2023) ........................................................................................................42

*Williams v. Garland*, 59 F.4th 620 (4th Cir. 2023), as amended (Feb. 10, 2023). 21, 56

*Wilson v. Thomas*, No. 5:14-CV-85-BO, 2014 WL 7405462 (E.D.N.C. Dec. 23, 2014) ....................................................................................................................54


**Statutes**

15 U.S.C.A. § 1011 ...........................................................................................34

21 U.S.C. § 811 .................................................................................................30

28 U.S.C. § 1292(a)(1) ......................................................................................13

28 U.S.C. § 1331 ...............................................................................................13

42 U.S.C. § 1983 ...............................................................................................13

AB § 36-101(ff) .................................................................................................15

AB § 36-404 ......................................................................................................14

AB § 36-404(d)(1) .............................................................................................13

## **INTRODUCTION**

Plaintiff-Appellant Justyna Jensen appeals the District of Maryland's Order denying her Motion for a Preliminary Injunction to prevent Defendants-Appellees Maryland Cannabis Administration and William Tilburg (Executive Director of Maryland Cannabis Administration) from issuing retail dispensary cannabis Licenses under their unconstitutional License Application Program.

In violation of the dormant Commerce Clause of the U.S. Constitution, Appellees favor Maryland residents over nonresidents in their Application Program to award Licenses to operate retail cannabis dispensaries. Ms. Jensen is a California resident who has never lived in Maryland. Appellees excluded Ms. Jensen from the License Application Program because she attended college in California rather than Maryland.

For clarity, this lawsuit is ***not*** about cannabis products crossing state lines. Ms. Jensen does not challenge any substantive law regarding the regulation of cannabis. Ms. Jensen does not challenge Maryland's laws or regulations regarding the handling, processing, tracking, taxing, etc. of cannabis. Rather, the only issue presented in this litigation is whether Maryland may favor in-state residents over nonresidents in ***investing in the ownership*** of a state-licensed cannabis business.

Although the Fourth Circuit reviews denials of preliminary injunctions for abuse of discretion, ***a district court abuses its discretion where, as here, a district***

*court misapprehends the underlying law or makes an error of law*. **The Fourth Circuit reviews a district court's legal conclusions de novo.** Moreover, the abuse of discretion review "is a rule of orderly judicial administration, not a limit on judicial power" and a court may proceed to plenary review if the necessary facts are not in dispute.

To obtain a preliminary injunction, a plaintiff must establish (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm without a preliminary injunction; (3) the balance of equities favors the plaintiff; and (4) the injunction is in the public interest. When the government is the defendant, the third and fourth factors merge because the government's interest is the public interest.

***For the first factor***, the District Court found Ms. Jensen did not show a likelihood of success on the merits because the District Court concluded the dormant Commerce Clause does not apply to state cannabis business licenses because cannabis is federally illegal under the Controlled Substances Act. ***Unless the Fourth Circuit reverses the District of Maryland's Order, it will create a circuit split with the First Circuit, the only circuit to address the issue to date, which concluded the dormant Commerce Clause applies to state cannabis licenses notwithstanding the Controlled Substances Act. It will also create a conflict with the majority of district court orders from around the country***.

The dormant Commerce Clause applies to state cannabis licenses because Supreme Court precedent holds that the dormant Commerce Clause applies to all interstate markets unless Congress "expressly states" its intention to exempt the market. Congress's intent must be "unmistakably clear." For example, in the context of insurance, Congress passed the McCarran-Ferguson Act to exempt state insurance regulations from the dormant Commerce Clause: "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."

The Controlled Substances Act contains no exemption for cannabis licenses. Thus, the dormant Commerce Clause applies, and Appellees may not favor in-state residents over nonresidents in granting cannabis business Licenses.

Notwithstanding the above, the District Court concluded that the dormant Commerce Clause does not apply to state cannabis business licenses because Congress made cannabis federally illegal under the Controlled Substances Act. That conclusion confuses the **Commerce Clause**, which **grants** power to **Congress** to make an interstate market illegal, with the **dormant Commerce Clause**, which **restricts** the power of the **states** to favor in-state residents over nonresidents. The Supreme Court has cautioned that "[t]he distinction is not always clearly observed,

9

for both questions may and indeed at times do arise in the same case and in close relationship.  But to blur them, and thereby equate the implied prohibition [on the states] with the affirmative endowment [to Congress] is altogether fallacious.  There is no such equivalence."

*For the second preliminary injunction factor*, the District Court found that Ms. Jensen satisfied the irreparable harm element.  The District Court acknowledged "the Fourth Circuit's clear precedent" that a dormant Commerce Clause violation is an irreparable harm.  (Because the District Court found the irreparable harm element satisfied, the District Court did not address Ms. Jensen's multiple other independent and adequate irreparable harms.)

*For the combined third and fourth factors*, the District Court found the factors not satisfied based on the District Court's error of law and clear error of fact.  The District Court acknowledged that the balance of equities favors a plaintiff subject to a potential constitutional violation and that the government and the public suffer no harm from a court enjoining a likely unconstitutional law.

The District Court, however, declined to follow the Fourth Circuit's clear precedent because the District Court's erroneously concluded that Ms. Jensen unduly delayed in bringing this litigation by waiting ***ten days*** from the date settlement discussion concluded to bring this litigation, or ***44 days*** from the date Appellees rejected her application, causing her claim to accrue.

The District Court further erroneously stated in balancing the burdens that other applicants in Appellee's application program "may have" spent money to prepare their applications. **The District Court provided no citation whatsoever for the District Court's bald speculation that applicants "may have" spent money on their applications.** Applicants were not required to lease property or incur other costs. The only cost for the applications was the application fee paid to Appellees, which Appellees can return. Counsel's review of the record does not uncover that **Appellees ever even argued that applicants spent any money on their applications, let alone set forth any evidence**.

In fact, the only discussion of costs counsel found in the record is that Maryland spent $650,000 to have an accounting firm review the applications. The **District Court Order will allow Appellees to violate Ms. Jensen's constitutional rights, along with the constitutional rights of residents of 49 of the 50 states, because Appellees spent $650,000 on an application program they already knew was unconstitutional.**

Moreover, most of the $650,000 Appellees spent for auditor work is reusable when Appellees revise the application program to make it constitutional. Thus Appellees (who are entirely responsible for the violation in the first place) will not lose any money. Appellees can allow applicants from colleges outside of Maryland, in which case Appellees can continue with the submitted applications

and reuse the entire $650,000 of auditor work; or Appellees can revise the definition of social equity to no longer rely on colleges, in which case Appellees can reuse all of the $650,000 work that relates to the two other definitions of social equity.

*If the Fourth Circuit does not reverse the District Court and remand with instructions to issue a preliminary injunction, Ms. Jensen will be left without a remedy for Appellees' knowing and intentional violation of Ms. Jensen's constitutional rights*.  Because of the Eleventh Amendment, a person cannot sue a state for damages.  Rather, a person's only remedy is to seek an injunction to prevent stop the constitutional violation.

After the District Court denied the preliminary injunction, Appellees held the Lottery to select applicants to proceed with the licensing process.  That licensing process takes months or even years in most jurisdictions, including leasing and remodeling the dispensary location and undergoing background checks.  If, however, the District Court does not issue a preliminary injunction and allows applicants to complete the licensing process while this case is proceeding, Appellees will argue at the end it is too late to claw back licenses from the applicants (a strategy that worked in other jurisdictions).  Thus, Ms. Jensen will be left without a remedy as she will not be able to obtain an injunction or damages.

## JURISDICTIONAL STATEMENT

The District of Maryland has jurisdiction under 28 U.S.C. § 1331 because Ms. Jensen brought claims under 42 U.S.C. § 1983 for violations of the United States Constitution.

The Fourth Circuit has jurisdiction to hear appeals of denials of preliminary injunctions under 28 U.S.C. § 1292(a)(1). The District Court issued the Order denying Ms. Jensen's Motion for TRO and Preliminary Injunction on February 27, 2024. Ms. Jensen timely appealed on March 9.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Did the District Court err in denying Ms. Jensen's Motion for a Preliminary Injunction to prevent Appellees from issuing any Licenses under their unconstitutional application program?

## STATEMENT OF THE CASE

### A.      The Application Program Favors Maryland Residents

The legislature amended Maryland Code, Alcoholic Beverages ("AB") section 36, to add provisions for cannabis business licenses on May 3, 2023. Appellees amended the Maryland Regulations (C.O.M.A.R.) 14.17.01.00, et seq. to add provisions for cannabis business licenses on July 1, 2023.

Only "social equity applicants" may apply for Licenses in the first round of the Application Program. AB § 36-404(d)(1). A social equity applicant is a business that is at least 65% owned by an individual who meets the criteria listed

below.  Appellees use a Lottery to select social equity applicants to proceed with the licensing process.  *Id*.

Appellees may accept only applications that conform with the requirements of AB § 36-404, including the social equity applicant requirements.  C.O.M.A.R. 14.17.05.02(B).  Appellees verify an applicant's social equity applicant status before the applicant may register for the Lottery.  C.O.M.A.R. 14.17.05.02(G). The requirement that applicants qualify as Social Equity Applicants may, but is not certain to, apply to future licensing application rounds as well. C.O.M.A.R. 14.17.05.03(E)(3)(d).

The qualifications for social equity applicant status discriminate against nonresidents in violation of the dormant Commerce Clause.  Appellees will approve an individual for social equity status if the individual attended a college where at least 40% of the students qualify for Pell Grants, ***but only if the college is in Maryland***:

"Social equity applicant" means an applicant for a cannabis license or cannabis registration that:

(1) ***has at least 65% ownership and control held by one or more individuals who***:

(i) have lived in a disproportionately impacted area for at least 5
of the 10 years immediately preceding the submission of
the application;

(ii) attended a public school in a disproportionately impacted
area for at least 5 years; or

(iii) *for at least 2 years, attended a 4-year institution of higher
education in the State where at least 40% of the
individuals who attend the institution of higher education
are eligible for a Pell Grant*; or

(2) meets any other criteria established by the Administration.

AB § 36-101(ff) (emphasis added); *see also* C.O.M.A.R. 14.17.01.01(B)(45).

Appellees published a list of the six colleges that qualify for part (1)(iii), all
of which are in Maryland: Bowie State University, Coppin State University,
Morgan State University, University of Baltimore, University of Maryland Eastern
Shore, Washington Adventist University.  (Decl. Garrison, Ex. E, JA194.)

The period to apply for verification as a social equity applicant opened on
September 8, 2023 and closed on November 7.  (JA191.)  Registration for the
Lottery opened on November 13 and closed on December 12.  (*Id.*)

**B.** **Ms. Jensen Satisfies All Application Requirements Except Appellees' Unconstitutional Maryland Residency Preference**

Ms. Jensen applied to be verified as a social equity applicant so she could register for the Lottery.  Ms. Jensen satisfies all requirements for a social equity applicant except the unconstitutional requirement that she attended a college in Maryland.

For at least two years, Ms. Jensen attended California State University at Long Beach.  (Decl. Jensen ¶ 5, JA023; Application, JA051.)  California State University at Long Beach is a four-year institution of higher education in California where at least 40% of the individuals who attend the institution are eligible for a Pell Grant.  (Decl. Jensen, ¶¶ 6-8, JA023; Exc. 2-4, JA032-45.)  As part of Ms. Jensen's application to be verified as a social equity applicant, she submitted to Appellees documentation to prove that she attended such a university.  (Decl. Jensen ¶ 3, Ex 5, JA046-080.)

On November 10, 2023, the contractor for Appellees called Ms. Jensen regarding her application.  The contractor stated that "out of state universities do not qualify" for a social equity applicant.  (Decl. Jensen ¶ 10, JA023.) When asked twice if there was any problem with Ms. Jensen's application other than the out-of-state college, the contractor responded that the call was only about Ms. Jensen's social equity status and the issue was that Ms. Jensen attended an out-of-state college.  (*Id*.)

Appellee rejected Ms. Jensen's application by letter dated December 13, 2023. (Decl. Jensen, Ex. 6, JA082.) The letter states, "This notice is to inform you that the State's partner in verifying your status as a social equity applicant was unable to verify that you meet the eligibility in any one of the [social equity applicant] criteria." (*Id*.)

Ms. Jensen requested her application report.  The application report states, "On 11/10/2023 the candidate was contacted via phone for additional information. The candidate was responsive to our outreach on 11/10/2023 via phone and was unable to provide us sufficient information to proceed with the validation."  (Decl. Jensen, Ex. 5, JA052.)

### C.  <u>Ms. Jensen Promptly Warned Appellees of the Constitutional Violation and The Brought Suit</u>

Appellees rejected Ms. Jensen's application by letter dated December 13, 2023.  (Decl. Jensen, Ex. 6, JA082.)  Ms. Jensen's counsel contacted Appellees' counsel by telephone on December 27 regarding Appellees' violation of Ms. Jensen's constitutional rights.  (Decl. Jensen ¶ 12, JA024.)  The parties engage in settlement discussions until January 16, 2024.  (*Id.*)

***On January 26, ten days after settlement negotiations concluded, Ms. Jensen filed this action.***  (*Id*. ¶ 13.)  On January 30, Ms. Jensen served the summons package on both Appellees.  (*Id*.)  The same day, Ms. Jensen filed the Proofs of Service as Docket Numbers 13 and 14.

On Thursday, February 1, Ms. Jensen's counsel contacted Appellees' counsel by telephone and left a voicemail stating that Ms. Jensen intended to file a motion for temporary restraining order within days. (*Id.* ¶ 14.) That same day, Ms. Jensen's counsel sent an email to Appellees' counsel reiterating that Ms. Jensen intended to file a motion for temporary restraining order within days. (*Id.*)

On February 1, Appellees' counsel responded to Ms. Jensen's counsel's email and disputed the manner of service of the summons. Ms. Jensen re-served the summons package the same day. (*Id.*) Also that day, counsel for Appellees entered their appearances as Docket Numbers 15 and 16.

On Tuesday, February 6, 2024, Ms. Jensen filed the Motion for TRO/Preliminary Injunction. (JA018.)

### D.    The District Court Denied the Preliminary Injunction

On February 22, the District Court heard Ms. Jensen's Motion for TRO/Preliminary Injunction.

***When the Court heard the Motion for TRO/Preliminary Injunction, Appellees had not even announced the date they would hold the Lottery to select social equity applicants to proceed with the licensing process, much less issued a timetable when selected applicants would complete the licensing process and Appellees would issue the Licenses***.

On February 27, the District Court denied the Motion. (Order, JA211.)

On March 5, Appellees announced they would hold the Lottery on March 14.  On March 14, Appellees held the Lottery to select social equity applicants who will proceed with licensing.

The selected social equity applicants must proceed with the licensing process, including obtaining property for their businesses and having their backgrounds reviewed.  To Ms. Jensen's knowledge, Appellees have not issued a timetable of when Appellees expect to issue Licenses.

### E.    <u>Procedural History</u>

Ms. Jensen filed this action on January 26, 2024.  She filed the Motion for TRO/Preliminary Injunction on February 6.  The District Court issued the Order denying the Motion on February 27.  Ms. Jensen filed the Notice of Appeal on March 9.  (JA238.)

<u>**SUMMARY OF THE ARGUMENT**</u>

The District Court abused its discretion in denying Ms. Jensen's Motion for a Preliminary Injunction, thereby leaving Ms. Jensen without a remedy for Appellees' blatant and knowing violation of her constitutional rights.

The District Court erred as a matter of law in finding Ms. Jensen did not show the first injunction factor—a likelihood of success on the merits—because the District Court concluded the dormant Commerce Clause does not apply to state cannabis licenses.  The dormant Commerce Clause applies to all interstate markets

unless Congress is "unmistakably clear" that it has exempted a market. The Supreme Court held in *Gonzales v. Raich* that an interstate market for cannabis exists, notwithstanding that the cannabis market is illegal.

The First Circuit, the only circuit to examine the issue, held that the Controlled Substances Act does not contain a clear exemption for cannabis from the dormant Commerce Clause. Therefore, the dormant Commerce Clause applies to state cannabis licenses. The majority of district courts also held that the dormant Commerce Clause applies to cannabis.

The District Court correctly found Ms. Jensen showed the second injunction factor—irreparable harm—because a constitutional violation is an irreparable harm.

The District Court erred as a mixed question of law and fact in finding Ms. Jensen did not show the third and fourth factors—the balance of harms and the public interest—favor an injunction. The District Court acknowledged Fourth Circuit precedent that the balance of harms favors and injunction against a potentially unconstitutional law and that the public interest faces no harm from an injunction against a potentially unconstitutional law. Nevertheless, the District Court incorrectly found this factor unsatisfied based on the District Court's error of fact and law that a 44 day delay from the accrual of a harm—during the Christmas and New Year holiday season—is an unreasonable delay.

20

## STANDARD OF REVIEW

The Fourth Circuit "review[s] a district court's denial of a preliminary injunction for abuse of discretion, reviewing factual findings for clear error and *legal conclusions de novo*.  A court abuses its discretion in denying preliminary injunctive relief when it rest[s] its decision on a clearly erroneous finding of a material fact, *or misapprehend[s] the law with respect to underlying issues in litigation*.  Likewise, the court abuses its discretion *when it makes an error of law* or ignores unrebutted, significant evidence." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (emphasis added) (internal quotation marks and citations omitted).

*Moreover, the abuse of discretion review "is a rule of orderly judicial administration, not a limit on judicial power" and a court may proceed to plenary review if the facts are not in dispute.* *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 757 (1986), overruled on other grounds.

Where an issue presents a mixed question of fact and law, the Fourth Circuit reviews the issue de novo if it is primarily a question of law or for clear error if it is primarily a question of fact.  *Williams v. Garland*, 59 F.4th 620, 633–34 (4th Cir. 2023), as amended (Feb. 10, 2023).

21

Here, the District Court's analysis of the preliminary injunction factors was based on the District Court's error of law in concluding the dormant Commerce Clause does not apply to cannabis licenses. As that conclusion of law is a question of first impression reviewed de novo, the district court's denial of the preliminary injunction is reviewed de novo.

## ARGUMENT

## I.    Preliminary Injunction Legal Standard

To obtain a preliminary injunction, a plaintiff must establish: (1) a likelihood of success on the merits, or a sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable harm without an injunction; (3) the balance of hardships tips in the plaintiff's favor; and (4) the public interest would not be disserved by an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Where, as here, the government is a party to the suit, the final two factors merge because the government's interest is the public interest. *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020).

## II.    The District Court Erred in Concluding Ms. Jensen Did Not Show a Likelihood of Success on the Merits

A district court abuses its discretion if it denies a preliminary injunction based on an incorrect legal standard. *Leaders of a Beautiful Struggle*, 2 F.4th 330,

339 (4th Cir. 2021). Here, the District Court concluded Ms. Jensen did not show a likelihood of success on the merits because the District Court concluded the dormant Commerce Clause does not apply to cannabis licenses because the Controlled Substances Act makes cannabis federally illegal. (Order, JA259.) The District Court is incorrect and must be reversed.

The only circuit to address the issue, the First Circuit, held that the dormant Commerce Clause applies to state cannabis licenses. Federal circuit courts should avoid creating circuit splits. *United States v. Heyward*, 42 F.4th 460, 482 (4th Cir. 2022); *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 737 F.3d 273, 280 (4th Cir. 2013); *United States v. Thomas*, 939 F.3d 1121, 1130 (10th Cir. 2019) (collecting cases from multiple circuits stating circuit courts should avoid creating circuit splits).

## A.  *<u>First Circuit</u>*

The First Circuit held the dormant Commerce Clause applies to cannabis licenses in *Northeast Patients Group. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542 (1st Cir. 2022). There, a Maine law required all officers or directors of a medical cannabis dispensary (directors and officers were defined to include owners) to be residents of Maine. *Id*. at 544. The district court granted a permanent injunction against the law. *Id*. at 545.

The state appealed, arguing that the dormant Commerce Clause does not apply to cannabis licenses because cannabis is federally illegal under the Controlled Substances Act. *Id*. at 546. The state brought three variations of this argument.

***Maine's first argument:*** Maine argued there cannot be an interstate market in a good that is federally illegal. *Id*. at 547. The First Circuit noted the Supreme Court already found an interstate market in cannabis exists, albeit illegally, in *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). In fact, Maine's prohibition of nonresidents owning Maine cannabis businesses "reflects the reality that the [interstate cannabis] market continues to operate." *Ne. Patients Grp.*, 45 F.4th 547.

Moreover, Maine "affirmatively encourage[d]" the interstate market in cannabis because Maine allowed medical cannabis patients from other states to purchase cannabis while visiting Maine if those patients had cannabis prescriptions from the other states. *Id*. at 547.

***As applied to this case, Maryland goes further in encouraging the interstate market in cannabis***. Maryland does not require visitors to Maryland to have cannabis prescriptions from other U.S. states to purchase cannabis. Rather, Maryland permits anyone to purchase cannabis if they have identification showing they are 21 years or older. Such identification is not limited to Maryland

24

identification; acceptable identification includes driver's licenses from any U.S. state, U.S. passports, U.S. military identification, and tribal cards. C.O.M.A.R. 14.17.12.04. *Maryland even encourages the international market for cannabis by allowing foreign persons to purchase cannabis using foreign passports. Id*.

*Maine's second argument:* Maine argued the dormant Commerce Clause restriction on state power does not apply to cannabis because Congress exercised its affirmative power under the Commerce Clause to regulate cannabis via the Controlled Substances Act. *Ne. Patients Grp.*, 45 F.4th 548.

The First Circuit rejected this argument because the Supreme Court held that an interstate market may be subject to both Congressional regulation under the Commerce Clause and a restriction on state regulation under the dormant Commerce Clause. *Id*. at 548-49 (citing *California v. Zook*, 336 U.S. 725 (1949)).

Therefore, the First Circuit concluded, Congress exercising its power under the Commerce Clause to make cannabis illegal is an issue distinct from the dormant Commerce Clause preventing a state from discriminating in granting cannabis licenses: "the negative implication of the commerce power may pose an independent bar to a state regulation of an interstate commercial market even when Congress chooses to exercise its affirmative commerce power with respect to that same market without also preempting that state regulation." *Id*.

25

As additional support, the First Circuit noted that Congress enacted the Rohrabacher-Farr Amendment after Congress passed the Controlled Substances Act. *Id*. at 549. That Amendment prohibits the Department of Justice from using any funds to prevent states from implementing laws for medical cannabis. "This congressional action in the wake of the CSA reflects that Congress contemplates both that an interstate market in medical marijuana may exist that is free from federal criminal enforcement and that, if so, this interstate market may be subject to state regulation." *Id*. at 549.

***As Applied to this case, the dormant Commerce Clause applies to Appellees' Application Program notwithstanding that Congress exercised its power under the Commerce Clause.*** As noted above, the First Circuit held that cannabis licenses are subject to both Congressional regulation under the Commerce Clause and a restriction on state regulation under the dormant Commerce Clause. *Id*. at 548-49 (citing *California v. Zook*, 336 U.S. 725 (1949)).

The District Court's conclusion that Appellees' Application Program is not subject to the dormant Commerce Clause because Congress made cannabis federally illegal under the Controlled Substances Act confuses the ***Commerce Clause***, which ***grants*** power to ***Congress*** to make an interstate market illegal, with the ***dormant Commerce Clause***, which ***restricts*** the power of ***states*** to favor in-state residents over nonresidents.

26

The Supreme Court cautioned that "[t]he distinction is not always clearly observed, for both questions may and indeed at times do arise in the same case and in close relationship.  But to blur them, and thereby equate the implied prohibition [on the states] with the affirmative endowment [to Congress] is altogether fallacious.  There is no such equivalence." *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 423 (1946).  As discussed above, Congress exercising its power under the Commerce Clause to make cannabis federally illegal is a distinct issue from the overlay of the dormant Commerce Clause that restricts a state's ability to discriminate against nonresidents.

Here, the District Court attempted to distinguish the First Circuit opinion because the First Circuit case dealt with medical cannabis licenses, whereas this case deals with adult use cannabis licenses.  This distinction fails on multiple bases.

First, the First Circuit holding did not depend on Maine's program being for medical cannabis.  As discussed above, the dormant Commerce Clause applies unless Congress expressly exempts a market, which Congress did not do for cannabis, whether medical or adult use.

The First Circuit discussed the Rohrabacher-Farr Amendment (now called the Rohrabacher-Blumenauer Amendment), but the First Circuit's analysis did not depend on the Rohrabacher-Farr Amendment.  Rather, the First Circuit cited the

Rohrabacher-Farr Amendment as additional support for its conclusion that the

dormant Commerce Clause applies notwithstanding the Controlled Substances Act.

*Ne. Patients Grp.*, 45 F.4th at 549.

Second, the First Circuit cited the Rohrabacher-Farr Amendment for the

proposition that "Congress contemplates both that an interstate market in medical

marijuana may exist that is free from federal criminal enforcement and that, if so,

this interstate market may be subject to state regulation." *Ne. Patients Grp.*, 45

F.4th at 549.

In this case, it is clear Congress also contemplates an interstate market in

adult use cannabis may exist that is free from federal criminal enforcement and that

this interstate market may be subject to state regulation.  Congress's questioning

and approval of Merrick Garland as Attorney General shows as much.

During the confirmation process, the Attorney General assured Congress

that the Department of Justice would not prosecute people who comply with state

cannabis programs:

> 46. The Justice Department, as part of the federal government,
> must enforce federal laws. An area where this has led to confusion is
> the enforcement of federal law in states where marijuana has been
> legalized. As you are aware, marijuana is a Schedule I drug under the
> Controlled Substances Act.

28

a. Under your leadership, how will you navigate the Justice Department's enforcement of federal law in states where marijuana has been legalized?

RESPONSE: As I suggested at my hearing, ***I do not think it the best use of the Department's limited resources to pursue prosecutions of those who are complying with the laws in states that have legalized and are effectively regulating marijuana.*** I do think we need to be sure, for example, that there are no end runs around the state laws by criminal enterprises, and that access is prohibited to minors.

b. What do you see the role of the Justice Department to be in the changing landscape of marijuana legalization, decriminalization, and recreational use?

RESPONSE: The Department of Justice has not historically devoted resources to prosecuting individuals for simple possession of marijuana. As I suggested at my hearing, ***I do not think it the best use of the Department's limited resources to pursue prosecutions of those who are complying with the laws in states that have legalized and are effectively regulating marijuana.*** I do think we need to be

sure, for example, that there are no end runs around the state laws by criminal enterprises, and that access is prohibited to minors.

Responses to Questions for the Record to Judge Merrick Garland, Nominee to be United States Attorney General, Question 46 (emphasis added).[1]

Third, the District Court misunderstood the Controlled Substances Act and gave insufficient credit to the executive branch's views of adult use cannabis. The District Court stated, "the express passage of a piece of legislation [Rohrabacher-Farr Amendment] by Congress is not the same as a non-binding sentiment expressed by an executive branch officer [Attorney General Merrick Garland] in a congressional hearing." (Order footnote 12, JA230-31.)

The District Court is incorrect, and gave insufficient weight to the Attorney General's treatment of adult use cannabis. ***Congress, in the Controlled Substances Act, granted the Attorney General power to reschedule cannabis or remove it from the Controlled Substances Act altogether***. "[T]he Attorney General may by rule—(1) add to such a schedule or transfer between such schedules any drug or other substance . . . (2) remove any drug or other substance from the schedules . . . ." 21 U.S.C. § 811.

---

[1] A*vailable at* https://www.judiciary.senate.gov/imo/media/doc/QFR%20Responses%202-281.pdf

Indeed, the executive branch recently committed to rescheduling cannabis from schedule I to schedule III to free cannabis businesses from the tax burden of 26 U.S.C. section 280E.  The executive branch does not need, and did not seek, Congress's approval for that rescheduling.

**Thus, Congress promulgated the Controlled Substances Act, and in doing so granted the executive branch, including the Attorney General specifically, the power to remove cannabis from the Controlled Substances Act.  Congress's confirmation of Merrick Garland after his testimony that the Department of Justice will not prosecute businesses that are complying with state cannabis laws shows that Congress contemplates a state-regulated adult use market free from federal interference**, as Congress contemplated for medical cannabis by passing the Rohrabacher-Farr Amendment.[2]

In fact, Congress acknowledges that "Both Congress and the Administration have the ability to alter marijuana's status as a Schedule I substance." Congressional Research Service, *The Schedule I Status of Marijuana* (Oct. 2022).[3]

---

[2] This is analogous to zone one of power under of *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952).

[3] *Available at* https://crsreports.congress.gov/product/pdf/IN/IN11204.
 "This court and numerous others routinely take judicial notice of information contained on state and federal government websites."  *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017).

Fourth, the First Circuit addressed Maine's medical cannabis licenses because Maine appealed only the injunction against the medical cannabis license program. As to adult use cannabis, the District of Maine issued an injunction against Maine's adult use license program, and Maine chose to voluntarily abandon the residency preference rather than take a futile appeal.

Maine had a residency preference for adult use cannabis licenses. *NPG, LLC v. City of Portland, Maine*, No. 2:20-CV-00208-NT, 2020 WL 4741913, at *2 (D. Me. Aug. 14, 2020). The District of Maine enjoined the residency preference under the dormant Commerce Clause. *Id*. The Maine Office of Marijuana Policy published the statement:

> At its core, the lawsuit alleged that the residency requirement found in the [Marijuana Legalization Act] is a violation of the dormant Commerce Clause of the United States Constitution by explicitly and purposefully favoring Maine residents over nonresidents. [¶] ***On Monday, the [Office of the Attorney General] and counsel for [the plaintiffs] filed a joint stipulation of dismissal in federal court acknowledging that the State of Maine was unlikely to prevail in a legal challenge to the adult use residency requirement and stating that the relevant sections of state law and administrative regulation would no longer be enforced***.

State of Maine, *State of Maine Will Not Enforce Marijuana Residency Requirement* (emphasis added).[4]

**Maine's third argument**.  Maine argued that Congress consented to state discrimination in cannabis licenses by enacting the Controlled Substances Act.  *Id*. at 550.  The First Circuit rejected this argument because, while Congress has the power to consent to state discrimination on interstate commerce, Congress did not do so through the Controlled Substances Act.  *Id*. at 551.

Supreme Court precedent holds the dormant Commerce Clause applies to all interstate markets unless Congress "expressly states" its intention to exempt the market.  *Id*. (citing *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 960 (1982); *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 427 (1946).

Congress's intent to exempt a market from the dormant Commerce Clause must be "unmistakably clear."  *Id*. (citing  *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984)).  For example, in the context of insurance, Congress exempted insurance from the dormant Commerce Clause in the McCarran-Ferguson Act.  It states: "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public

---

[4] *Available at* https://www.maine.gov/dafs/omp/news-events/news/aump-lawsuit-residency-requirement. The Court may take judicial notice as stated in footnote 2.

interest, and that silence on the part of the Congress shall not be construed to

impose any barrier to the regulation or taxation of such business by the several

States." 15 U.S.C.A. § 1011. *The Controlled Substances Act contains no express*

*exemption for cannabis from the dormant Commerce Clause, and no party has*

*argued otherwise in any cannabis licensing case*.

　　　*As applied to this case, congress did not consent to Appellees'*

*discrimination.* The District Court concluded that the dormant Commerce Clause

does not apply to cannabis because it "seeks to preserve a national market for

competition undisturbed by preferential advantages conferred by a State upon its

residents or resident competitors . . . but this goal is not served by encouraging

such a market for a good that Congress has already expressly declared to be illegal

and against the public interest." (Order, JA260 (citing *Gen. Motors Corp. v. Tracy*,

519 U.S. 278, 299 (1997)).

　　　*The First Circuit rejected this argument because it would require a*

*reversal of the standard presumption that state protectionism is not permitted*

*absent congressional approval.* "[W]e would have to do more than abandon the

ordinary rule that Congress does not mean to consent to such measures unless it

does so in unmistakably clear terms. We would have to adopt the presumption that

Congress does mean to consent to such measures whenever it makes participation

in an interstate market a crime." *Id*. at 554.

The First Circuit also pointed out that a protectionist cannabis licensing program does nothing to advance the goal of the Controlled Substances Act. Rather than prevent any cannabis from being sold, residency requirements just ensure the profits from cannabis sales are retained by state residents:

> [I]t can hardly be said that a state effort to protect a market in medical marijuana from out-of-state competition necessarily advances Congress's evident goal in the CSA of preventing entry into that market. Such protectionism does, of course, stop out-of-staters from entering the market. But, it does so only by simultaneously insulating in-state actors who do choose to enter that market from competition. It thus threatens, in the way that protectionist measures necessarily do, to encourage precisely what the CSA seeks to stop—trade by in-staters in the relevant market. ***Indeed, if that were not Maine's aim in imposing the residency requirement, then why would Maine not have simply prohibited dispensaries altogether, rather than protected those run by Mainers from outside competition? For these reasons, we conclude that, while Maine's residency requirement does limit some actors from trading in medical marijuana, it does so in a way that, due to its protectionist nature, in no sense "aid[s]" the policy expressed by Congress in the CSA***.

*Id.* at 554-55.  Thus, the protectionist cannabis license programs do nothing to aid the federal government, and instead protect state monopolies.

Here, Appellees' license application program does not aid the federal government.  As the First Circuit noted, if Appellees wished to support the Controlled Substances Act, Appellees would prohibit cannabis business altogether.  Instead, Appellees license cannabis businesses.  In fact, Appellees permit out-of-state applicants to own up to 35% of any cannabis license.  Appellees even permit out-of-state applicants to own 100% of a cannabis license if the applicant attended a qualifying college in Maryland or meets other qualifiers.  Thus, Appellees' Application Program does not aid the Controlled Substances Act.  Instead, it impermissibly prefers Maryland residents for the economic benefits.

In an analogous context, the Supreme Court has rejected state efforts to favor their residents with alcohol businesses.  Congress enacted the Twenty First Amendment, which provides that "[t]he transportation or importation into any state, territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

Notwithstanding that Congress expressly prohibited people from importing alcohol into a state without the state's permission, alcohol falls within the dormant Commerce Clause.  The purpose of the Twenty First Amendment was to permit states to control alcohol, not to favor its residents in commerce.  "The aim of the

Twenty-first Amendment was to allow States to maintain an effective and uniform system for controlling liquor by regulating its transportation, importation, and use. The Amendment did not give States the authority to pass nonuniform laws in order to discriminate against out-of-state goods, a privilege they had not enjoyed at any earlier time." *Granholm v. Heald*, 544 U.S. 460, 484–85 (2005).

*Likewise, Congress enacted Controlled Substances Act to regulate drugs and promote public health.  Congress did not enact the Controlled Substances Act to permit states to favor their residents in commerce*.

Under the Twenty First Amendment, a state can prohibit alcohol altogether. *Id*. A state may permit alcohol but prohibit wineries from shipping directly to its resident consumers. *Id*. A state may not, however, allow in-state wineries to ship directly to its resident consumers but prohibit out-of-state wineries from doing the same. *Id*. Likewise, a state may issue licenses to sell alcohol, but a state may not reserve those licenses for its own residents. *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 538 (2019) ("That [Twenty-First Amendment] allows each State leeway to enact the measures that its citizens believe are appropriate to address the public health and safety effects of alcohol use and to serve other legitimate interests, but it does not license the States to adopt protectionist measures with no demonstrable connection to those interests.").

Here, states may prohibit cannabis or may regulate how cannabis is sold. States may not, however, discriminate against out-of-state business interests in granting cannabis licenses.

**Purpose of the dormant Commerce Clause.**  Additionally, though ignored by the First Circuit, the primary purpose of the dormant Commerce Clause is not to preserve competition in the national markets.  Rather, the primary purpose of the dormant Commerce Clause is to prevent trade wars between the states.  *See Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 522 (1935) ("We are reminded in the opinion below that a chief occasion of the commerce clauses was 'the mutual jealousies and aggressions of the States, taking form in customs barriers and other economic retaliation.'").  If the Court allows one state to favor its own residents, "the door has been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation."  *Id*.

In fact, the Commerce Clause, and the dormant Commerce Clause, was a principal reason the Framers called for the Constitutional Convention.

> The few simple words of the Commerce Clause—"The Congress shall have Power…  To regulate Commerce… among the several States…"—reflected a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to

avoid the tendencies toward economic Balkanization that had plagued

relations among the Colonies and later among the States under the

Articles of Confederation.

*Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979).

The Supreme Court has consistently noted this primary purpose of the

dormant Commerce Clause:

During the first years of our history as an independent

confederation, the National Government lacked the power to regulate

commerce among the States.  Because each State was free to adopt

measures fostering its own local interests without regard to possible

prejudice to nonresidents, what Justice Johnson characterized as a

"conflict of commercial regulations, destructive to the harmony of the

States," ensued.  In his view, this "was the immediate cause that led to

the forming of a [constitutional] convention."  "***If there was any one***

***object riding over every other in the adoption of the constitution, it***

***was to keep the commercial intercourse among the States free from***

***all invidious and partial restraints.***"

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S.

564, 571 (1997); *see also C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*,

511 U.S. 383, 390 (1994) ("The central rationale for the rule against

discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent."); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623 (1978); *Gibbons v. Ogden*, 22 U.S. 1, 11 (1824).

As to cannabis, state trade wars are already sprouting.  States have passed or proposed legislation allowing the governors to enter into interstate trade agreements on a state-by-state basis.  *See* Rev. Code WA § 43.06.495; Cal. Bus. & Prof. Code §26301; OR S.B. 582 (2019); AZ H.B. 2770 (2024). (No such agreements have been executed to date, to the best of Ms. Jensen's knowledge.)

## B.    *Seventh Circuit*

The Seventh Circuit ruled on an appeal of the denial of a preliminary injunction, thereby indicating that the dormant Commerce Clause applies to cannabis.  *Finch v. Treto*, 82 F.4th 572, 575 (7th Cir. 2023).  The court affirmed a denial of a preliminary injunction on complicated facts far removed from this case, including that the plaintiffs never even applied in the Illinois license application program (one of the two plaintiffs would not even state whether he was aware of the application program before it ended[5]) and the plaintiffs brought their suit nearly two years after the state selected the applicants for licensing.

---

[5] *Finch v. Treto*, 606 F. Supp. 3d 811, 819 (N.D. Ill. 2022).

In *Finch*, Illinois took applications for cannabis licenses until January 2020. In September 2020, the state announced that there were more applications with perfect scores than there were available licenses, so the state would hold lotteries to select among the perfect-scoring applicants. *Id*. The state held the lotteries in July and August 2020 and announced the winners in September 2020. *Id*. at *5.

The plaintiffs filed the lawsuit in March 2022. *Id*. at *6. Notably, Illinois would not have rejected the plaintiffs' applications if the plaintiffs had applied. Rather than barring out-of-state applicants (like Appellees bar out-of-state college alumni), Illinois accepted applications from anyone, and just gave additional points to local residents. *Id*. at *3. Thus, nothing prevented the plaintiffs from submitting timely applications.

The court concluded the plaintiffs had standing to challenge the program notwithstanding that they had never even applied for licenses and brought their lawsuit two years after applicants were chosen. *Id*. at *9. The court, however, denied a preliminary injunction based on the unique facts of the case.

The Seventh Circuit affirmed the denial of the preliminary injunction based on a combination of factors. The plaintiffs waited to bring the lawsuit until more than two years after the license application program closed and the winners had been chosen and tie-breaking lotteries were held; state court judges had ruled in multiple state-court cases brought by participants in the licensing program and

41

lotteries, and a the preliminary injunction would have upended those state court decisions; and because the plaintiffs had not applied for licenses, the court could not even determine for which geographic area of the state the plaintiffs should have been considered. *Id*. at 17-20. The court concluded that "although no single argument by the [defendants] is conclusive on its own, together the arguments show why equitable relief (here, an injunction) is unwarranted." *Id*. at *8.

Here, by contrast, Ms. Jensen applied in Appellees' Application Program and brought this lawsuit before Appellees even announced the date of the Lottery to select applicants to proceed with licensing, much less completed the lengthy licensing process with any applicant and granted Licenses.

After the District Court denied Ms. Jensen's Motion for a Preliminary Injunction, Appellees held the Lottery. Appellees have not, however issued any Licenses or even issued a timetable when Appellees expect applicants to complete the licensing process.

## C. *District Court Injunctions*

The Northern District of New York issued a preliminary injunction against the State of New York's application program. *Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232 (N.D.N.Y. 2022), reconsideration denied, No. 122CV1013GLSDJS, 2023 WL 1420662 (N.D.N.Y. Jan. 31, 2023). The court concluded that Respondents favored New York applicants by requiring a cannabis

conviction from New York and a "Significant presence in New York," such as a bank account in the state.  *Id*. at 241.  The state appealed to the Second Circuit. While the appeal was pending, the state moved in the Second Circuit for a stay of the preliminary injunction or in the alternative a narrowing of the preliminary injunction.  The Second Circuit denied the state's request for a stay and instead left the preliminary injunction in place, and merely narrowed the preliminary injunction to cover only the geographic area of New York where the plaintiff could be eligible for a license.  (Second Circuit Order, JA121.)  The case then settled.

Other district courts have held that the dormant Commerce Clause applies to cannabis licensing programs.  *See NPG, LLC v. City of Portland, Maine*, No. 2:20-CV-00208-NT, 2020 WL 4741913, at *6 (D. Me. Aug. 14, 2020) ("The City portrays the Controlled Substances Act as a form of congressional consent.  But the Act nowhere says that states may enact laws that give preference to in-state economic interests.  In other words, although the Controlled Substances Act criminalizes marijuana, it does not affirmatively grant states the power to 'burden interstate commerce 'in a manner which would otherwise not be permissible.'") (internal citations omitted); *Toigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985, 992 (W.D. Mo. 2021); *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 815 (E.D. Mich. 2021).

### D.     *Minority Jurisdiction*

The Western District of Washington held in two cases that the dormant

Commerce Clause does not apply to cannabis licenses.  One case is currently on

appeal.  *See Peridot Tree WA Inc. v. Washington State Liquor & Cannabis Control*

*Bd.*, No. 3:23-CV-06111-TMC, 2024 WL 69733, at *1 (W.D. Wash. Jan. 5, 2024).

In the other case, *Brinkmeyer v. Washington State Liquor & Cannabis Bd.*,

No. C20-5661 BHS, 2023 WL 1798173 (W.D. Wash. Feb. 7, 2023), the court

stated: "Although Washington's 'legalization' of cannabis certainly does not align

with Congress's intent, the residency requirements do.  The residency requirements

attempt to prevent any interstate commerce in cannabis and to prevent cannabis

from Washington from moving into states where it remains illegal, like Idaho."  *Id.*

at *12.

That statement has no application to this case because Ms. Jensen does not

challenge any prohibition on cannabis crossing state lines.  Ms. Jensen challenges

only the unconstitutional favoritism of Maryland residents in Respondents'

Application Program.[6]

---

[6] *Brinkmeyer* also states that a person does not have a federal property right to
cannabis while it remains federally illegal or a federal right to participate in a
federally illegal market.  Property rights are irrelevant to this action, as Appellant
did not bring a due process claim of denial of a property right.  Rather, Appellant
asserts her right under the dormant Commerce Clause to participate in
Washington's licensing program.

The Northern District of New York, breaking from *Variscite One* (discussed above) followed *Brinkmeyer* and held the dormant Commerce Clause does not apply to cannabis in *Variscite NY Four, LLC v. New York State Cannabis Control Bd.*, No. 123CV01599AMNCFH, 2024 WL 406490, at *14 (N.D.N.Y. Feb. 2, 2024). That case is on appeal.

The District of Oklahoma refused to apply the dormant Commerce Clause to cannabis licenses in *Original Investments, LLC v. State of Oklahoma*, 542 F. Supp. 3d 1230, 1233 (W.D. Okla. 2021). The court refused to enjoin residency requirements because the court concluded that would be using the court's equitable powers to facilitate a violation of the Controlled Substances Act by helping an out-of-state person obtain an Oklahoma cannabis license. *Id.*

The court's analysis of equity is incorrect. For example, a party is not subject to the unclean hands defense merely because it engaged in wrongful activity. Rather, the court must balance the wrongful conduct of both parties. *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 960 (9th Cir. 2015) ("The bankruptcy court failed to conduct the required balancing, instead concluding solely from the fact that Northbay had engaged in wrongful activity that the doctrine of unclean hands applied. In so doing, the bankruptcy court made an error of law, and thus abused its discretion.").

In light of the balancing test, "the application of this doctrine [does not] make equitable sense in a [cannabis licensing] case like this one, where the plaintiff seeks to participate in a state-sanctioned (but federally illegal) market and the defendant has allegedly engaged in a constitutional violation in organizing that market. If the 'unclean hands' notion has any purchase here, both parties have 'unclean hands' in that they are engaging with the business of distributing a controlled substance, ***but only one party has soiled the federal Constitution***." *Finch*, 606 F. Supp. 3d at 833–34 (citation omitted) (emphasis added).

Likewise, a request for an injunction is not subject to an illegality defense. "[E]njoining the licenses awarded under the [cannabis license] lotteries or enjoining the Department from using discriminatory criteria in its licensing scheme would not compel any party to violate federal law, award any illegally derived profits, or entangle this court in the production, sale, or distribution of cannabis. It would prevent [state government] from discriminating against nonresidents in awarding conditional dispensary licenses, only after which would the state award such a license and then regulate cannabis-related conduct." *Finch,* 606 F. Supp. 3d at 833–34.

Furthermore, under the District of Oklahoma's position that it will not use its equitable powers to enjoin a constitutional violation because cannabis is federally

illegal, it makes no difference whether the constitutional right is under the dormant Commerce Clause or the right to be free of racial or sexual discrimination.[7]

### E.   *Scope of Relief*

The District Court stated, in an error of law, that Ms. Jensen is unlikely to succeed because the relief she seeks is overbroad.  The District Court is incorrect for multiple reasons.  First, Ms. Jensen showed a dormant Commerce Clause violation, and she will prevail even if the District Court awards narrower relief than she seeks.  The District Court provided no citation for its incorrect proposition that Ms. Jensen will not prevail if she shows a dormant Commerce Clause violation but the District Court strikes less than all of the challenged statute provision.

Second, the relief Ms. Jensen seeks is not overbroad.  It is described in the Complaint: an injunction and a declaration against MD Code, Al Bev § 36-101(ff); MD Code, Al Bev § 36-404(d)(1); C.O.M.A.R. 14.17.05.02(B); C.O.M.A.R. 14.17.05.02(G); and C.O.M.A.R. 14.17.05.03(E)(3)(d).  The Fourth Circuit can

---

[7] Two other district courts within the Ninth Circuit abstained from hearing dormant Commerce Clause challenges to cannabis licensing programs on the basis that cannabis is federally illegal under the Controlled Substances Act.  Both cases were reversed.  *See Peridot Tree, Inc. v. City of Sacramento*, 94 F.4th 916 (9th Cir. 2024), directly reversing *Peridot Tree, Inc. v. City of Sacramento*, No. 2:22-CV-00289-KJM-DB, 2022 WL 10629241 (E.D. Cal. Oct. 18, 2022) and indirectly reversing *Variscite, Inc. v. City of Los Angeles*, No. 2:22-CV-08685-SPG-SK, 2022 WL 18397510 (C.D. Cal. Dec. 8, 2022).

read those code sections itself and determine whether a prayer to strike those code sections is overbroad.

Moreover, the District Court must strike the entire unconstitutional code subsections and not rewrite those subsections through a line item veto. Respondents themselves in opposing the preliminary injunction wrote, "The Supreme Court cautioned against exactly this form of judicial legislation, where a court would be attempting to amend laws in a way that conforms with the legislative intent." (Docket #24 (citing *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 479 (1995))).[8]

Furthermore, the District Court stated that a court must leave intact the sections of a statute that are constitutional and are consistent with the legislature's basic objections of the statute. (Order footnote 15, JA263.) As to the Application Program, Appellees stated that the purpose of the statute is "Creating Economic Opportunities for Those Who Attended Schools That Serve a Significant Population of Students Eligible for Government Benefits." (Docket 24 at 22.) If the District Court strikes the school subsection and allows the remainder of the

---

[8] The transcript of the hearing is mangled. In response to the District Court's question about striking only part iii of MD Code, Al Bev § 36-101(ff), Appellant's counsel responded, "that would be essentially a line item [veto] to go in and strike a portion. It is essentially the same as striking out [lines] in the stat[u]te." (JA 292-93.)

Application Program to go forward, it will frustrate the legislature's purpose of benefitting students who attended schools that serve a significant population of students eligible for government benefits.  Thus, the District Court must enjoin the entire code subsections identified above.

And again, whether the District Court at the end of the case strikes the entire code subsections or only the college-related lines is irrelevant to a preliminary injunction motion.   The only issue is whether Ms. Jensen showed a likelihood of success on her dormant Commerce Clause challenge that she was unconstitutionally excluded from the Application Program and the District Court must issue a preliminary injunction to halt the violation.  Whether the District Court eventually strikes the entire MD Code, Al Bev § 36-101(ff) or just subsection (iii) will be decided later.

## III.   **The District Court Correctly Found Ms. Jensen Showed Irreparable Harm**

The District Court found that Ms. Jensen showed an irreparable harm because of "the Fourth Circuit's clear precedent" that a dormant Commerce Clause violation is an irreparable harm.  (Order, JA222.)

In light of that finding, the District Court did not address Ms. Jensen's multiple additional independent and adequate irreparable harms.

*First*, Ms. Jensen will be left without a remedy if Appellees issue all Licenses while this case is pending.  States, unlike cities, enjoy immunity under the

Eleventh Amendment from claims for damages. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102-03 (1984). If a state selects licensees through an unconstitutional program, an excluded applicant's only remedy is to sue the state official in his/her official capacity for an injunction to prevent the official from issuing the licenses. *See id.* An applicant cannot sue a state for monetary damages. *Id*.

Because Ms. Jensen cannot recover monetary damages, her harm is irreparable. Even if a plaintiff will suffer a purely economic injury, the plaintiff's harm is irreparable if the plaintiff cannot recover the economic loss from the defendant at the end of the case. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 218 (4th Cir. 2019).

Here, because Ms. Jensen cannot recover monetary damages at the end of the case, if the Circuit does not reverse and remand with instructions to issue a preliminary injunction, Appellees will issue all the licenses while the case is proceeding. Ms. Jensen will be left without a remedy for the constitutional violation because Appellees will argue at the end of the case that it is too late as a matter of equity to claw back from Lottery winners Licenses issued long ago.

This tactic was used in Illinois successfully and is being tried in New York and Los Angeles at this time. In the Seventh Circuit, the Northern District of Illinois denied the plaintiffs a preliminary injunction, as discussed above, in *Finch*,

2022 WL 2073572.  The plaintiffs appealed, but by the time the Seventh Circuit ruled, the government had issued the licenses.  Thus, the Seventh Circuit concluded the appeal was moot.  *Finch v. Treto*, 82 F.4th 572, 575 (7th Cir. 2023) ("The district judge's denial of the motion for a preliminary injunction cleared the way for the Department to issue the 2021 licenses, and it did so. That action largely moots this appeal.")

*Finch*, however, differs from the instant case in important ways (as also discussed above).  The *Finch* plaintiffs did not apply in the Illinois application program, and they did not bring their litigation until roughly two years after the application program had closed and the winning applicants had been selected.  The plaintiffs also waited until several state court lawsuits concerning the application program had been resolved.  In light of these facts, the Seventh Circuit concluded that it would be inequitable to recall licenses the state issued after the district court denied the plaintiff's motion for preliminary injunction.  *Finch*, 82 F.4th at 575 ("To the extent that some form of relief unwinding the licenses remains possible, the judge weighed the equities and held that the plaintiffs waited far too long to challenge the residency provisions.  By March 2022 when they filed this suit, the 2021 licenses had already been allocated on a conditional basis.").

Here, Ms. Jensen filed the litigation with remarkable speed.  *See* discussion below part IV.

51

**Second**, Ms. Jensen will suffer irreparable harm by being excluded from the Maryland cannabis market. Even if Appellees hold a later application round, and even if Appellees revise the eligibility rules so Ms. Jensen may apply, a reduced chance of receiving a cannabis license is an irreparable harm. *See Finch*, 2022 WL 2073572, at *16 ("If the court declined to grant injunctive relief as to the 2021 lotteries, it would allow the Department to proceed with issuing the first 185 licenses. Once those 185 licenses are issued, Appellants' chances of obtaining their own licenses will be statistically narrowed, as the total number of licenses is capped at 500 by statute. In short, the court concludes Appellants have satisfied the irreparable-harm requirement."); *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 816 (E.D. Mich. 2021) ("[P]laintiff has demonstrated that she will suffer irreparable injury absent an injunction, as she would, at best, be significantly disadvantaged in applying for a recreational marijuana retail license (assuming fifty percent of the licenses are reserved for legacy applicants) and, at worst, be entirely eliminated from consideration for such a license (if all of the licenses are awarded to legacy applicants).").

**Third**, even if Ms. Jensen could somehow later enter the market, the delay in entering the market causes irreparable harm. All advantages to early entrants in the market, such as access to customers who have not developed loyalty to other businesses, will have been claimed. *See, NPG, LLC v. City of Portland, Maine*,

No. 2:20-CV-00208-NT, 2020 WL 4741913, at *11 (D. Me. Aug. 14, 2020) ("I agree that the unique context of this new market suggests that the timing of a ruling in the Plaintiffs' favor is particularly important. The Plaintiffs are not seeking to enter an established [cannabis] market, where the significance of any further delay of their participation is likely diminished. Rather, the Plaintiffs are seeking to be in the first wave of [cannabis] licensees as a new market launches and are hoping to attract customers who have not yet developed allegiances."); *Quezada v. BP Prods. N. Am., Inc.*, No. 06 CV 5378 (SJ), 2006 WL 3837720 (E.D.N.Y. Dec. 1, 2006) (temporary inability to sell goods is irreparable harm of loss of good will); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."); *Starlight Sugar, Inc. v. Soto*, 114 F.3d 330, 332 (1st Cir. 1997) ("While it is true that injunctive relief is generally inappropriate where money damages can make a plaintiff whole, we have recognized that the loss of a unique or fleeting business opportunity can constitute irreparable injury."); *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005) ("[I]t is precisely the difficulty of pinning down what business has

been or will be lost that makes an injury 'irreparable.'"); and *Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865, 872–73 (7th Cir. 2009) ("The district court concluded that the harm to Pro's was irreparable because it was difficult to ascertain the specific amount of revenue being lost, and because damages might come too late to adequately compensate the plaintiff's business.").

## IV. The District Court Erred in Finding the Balance of Equities and the Public Interest Favor Appellees

Where the government is a party to the suit, the final two factors—balance of equities and the public interest—merge. *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020).

The public interest favors an injunction whenever constitutional rights are at stake. "[I]t is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle*, 2 F.4th at 346. "[T]he harm to defendants if an injunction is granted is virtually nonexistent. Compliance with the law is not a cognizable hardship on a defendant." *Wilson v. Thomas*, No. 5:14-CV-85-BO, 2014 WL 7405462, at *3 (E.D.N.C. Dec. 23, 2014).

The same applies in cannabis. "[T]he public interest is best served by enjoining the enforcement of [a cannabis licensing] ordinance that is likely unconstitutional." *Lowe*, 544 F. Supp. 3d at 816.

The Fourth Circuit need proceed no further on the final factor, and Ms. Jensen demonstrated that the balance of harms and public interest favors an injunction.

If, however, the Fourth Circuit proceeds with further analysis, the District Court erred. The District Court acknowledged that "the Fourth Circuit has held that 'a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.'" (Order, JA223 (citing *Leaders of a Beautiful Struggle*, 2 F.4th at 346) (quoting *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013)).

Nevertheless, the District Court stated, "While this may be the general rule, there are unique factors at play in this case that complicate the analysis." (Order, JA223.) The District Court did not cite any Fourth Circuit authority that its holding that a state is not harmed by a preliminary injunction against a likely unconstitutional law may be overridden.

Instead, the District Court overrode the Fourth Circuit's binding precedent based on two things: (1) the District Court's incorrect conclusion that Ms. Jensen delayed in brining the action and (2) the District Court's incorrect conclusion that a preliminary injunction would encouraging an interstate practice in cannabis.

The Fourth Circuit reviews these conclusions de novo. Where an issue presents a mixed question of fact and law, the Circuit reviews the issue de novo if it is primarily a question of law or for clear error if it is primarily a question of fact. *Williams v. Garland*, 59 F.4th 620, 633–34 (4th Cir. 2023), as amended (Feb. 10,

2023). Here, whether Ms. Jensen delayed and whether an injunction would encourage interstate activity are mixed questions of law and fact. Both questions sound primarily in law, as discussed below.

A.    ___No Delay___

The District Court erred in concluding that Ms. Jensen delayed in bringing this litigation. In fact, Ms. Jensen brought this case with remarkable speed.

The statute of limitations on a dormant Commerce Clause claim is **_three years from accrual_**.[9] Ms. Jensen's claim accrued on December 13, 2023 when Appellees rejected Ms. Jensen's application by letter. (Decl. Jensen, Ex. 6, JA082.)

Ms. Jensen's counsel contacted Appellees' counsel by telephone regarding Appellees' violation of Ms. Jensen's constitutional rights on December 27—**_just two weeks after Respondents sent Ms. Jensen a rejection letter_**. (Decl. Jensen ¶ 12, JA024.) The parties engage in settlement discussions until January 16, 2024. (*Id.*)

**_On January 26, ten days after settlement negotiations concluded, Ms. Jensen filed this action._** (*Id.* ¶ 13.) On January 30, Ms. Jensen served the

---

[9] Section 1983 claims are subject to the state's statute of limitations for personal-injury claims. *Neita v. City of Chicago*, 830 F.3d 494, 498 (7th Cir. 2016). IN Maryland, "A civil action at law shall be filed within three years from the date it accrues . . . ." Md. Code, Cts. & Jud. Proc. § 5-101.

summons package on both Appellees. (*Id*.) The same day, Ms. Jensen filed the Proofs of Service as Docket Numbers 13 and 14.

On Thursday, February 1, Ms. Jensen's counsel contacted Appellees' counsel by telephone and left a voicemail stating that Ms. Jensen intended to file a motion for temporary restraining order within days. (*Id*. ¶ 14.) That same day, Ms. Jensen's counsel sent an email to Appellees' counsel reiterating that Ms. Jensen intended to file a motion for temporary restraining order within days. (*Id*.)

On February 1, Appellees' counsel responded to Ms. Jensen's counsel's email and disputed the manner of service of the summons. Ms. Jensen re-served the summons package the same day. (*Id*.) Also that day, counsel for Appellees entered their appearances as Docket Numbers 15 and 16. On Tuesday, February 6, 2024, Ms. Jensen filed the Motion for TRO/Preliminary Injunction. (JA018.)

***Thus, notwithstanding the three-year statute of limitations, Ms. Jensen filed this action 44 days after the claim accrued, or ten days after settlement discussions ended. These days included both the Christmas holiday and New Year's holiday.***

Nevertheless, the District Court concluded this miniscule delay shifted the balance of equities based on three cases. (Order, JA252.) The first case is *Finch v. Treto*, 606 F. Supp. 3d 811 (N.D. Ill. 2022). This brief discusses *Finch* above in Argument Part III, but Ms. Jensen asks the Fourth Circuit to read *Finch* itself to see the stark differences between that case this case. Among many other things, the

plaintiffs in *Finch* **never applied for licenses** and one plaintiff would not even state whether he was aware of the license program before the application deadline. Nothing prevented the plaintiffs from applying, as the Illinois program accepted applications from anyone but unconstitutionally awarded additional points for state residency. The plaintiffs showed up for the first time **two years after licenses were issued** and sought to enjoin the licenses. By the time the plaintiffs filed their case, the application program had been litigated in **multiple state and federal lawsuits** brought by other plaintiffs who had applied in the application program. The Seventh Circuit did not want to undo those multiple state court litigations for two plaintiffs who did not even apply and showed up years later.

Here, Ms. Jensen applied in the application program and she brought this case before Appellees even announced the date of the Lottery, much less held the Lottery.

After the District Court denied the preliminary injunction, Appellees held the Lottery on March 14. To Ms. Jensen's knowledge, Appellees have not completed the licensing program with any applicant chosen in the Lottery, or even issued a timetable when Appellees anticipate completing the licensing process. (The licensing process takes months or years in other jurisdictions.) There have been no other lawsuits against Appellees brought and resolved by any other applicants in the Application Program.

The other two cases the District Court relied on denied preliminary injunctions based on the plaintiff's purported delays. Both of those cases are on appeal, and are of no precedential value. In the first case, *Peridot Tree WA Inc. v. Washington State Liquor & Cannabis Control Bd.*, No. 3:23-CV-06111-TMC, 2024 WL 69733, at *10 (W.D. Wash. Jan. 5, 2024), the court found the plaintiff did not demonstrate irreparable harm because of a delay. The court listed several purported triggering dates, ranging from eleven years before the plaintiff filed the action to eight months before the plaintiff filed the action. While the plaintiff disagreed with the court and appealed the action, the purported delay in *Peridot Tree* is different from the 10 day (from settlement negotiations) or 44 day (from accrual) "delay" at issue here.

Moreover, the court in *Peridot Tree* in denying the preliminary injunction cited only one case regarding delay, *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1375 (9th Cir. 1985). In that case, the plaintiff sought a preliminary injunction against contract terms that had been in place "for many years." *Id.*

The second case relied upon by the District Court, *Variscite NY Four, LLC v. New York State Cannabis Control Bd.*, No. 123CV01599AMNCFH, 2024 WL 406490, at *14 (N.D.N.Y. Feb. 2, 2024) relies on *Peridot Tree*. Thus, it is distinguishable for the reasons discussed above. Moreover, *Variscite Four* directly contradicts an earlier case from the same district, *Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232 (N.D.N.Y. 2022), reconsideration denied, No.

122CV1013GLSDJS, 2023 WL 1420662 (N.D.N.Y. Jan. 31, 2023), where the plaintiff obtained a preliminary injunction based on a motion brought on the same time table as *Variscite Four*.

*Variscite Four* is currently on appeal, as noted above, and has no precedential value.  In *Variscite One*, by contrast, the government took an appeal to the Second Circuit and asked the Second Circuit to stay the preliminary injunction while the appeal was pending.  The Second Circuit denied the motion to stay and left the preliminary injunction in place, albeit narrowed to the geographic areas of New York in dispute.  (Second Circuit Order, JA114.)  The case then settled.

### B.    *Interstate Activity*

The District Court erred in concluding that an injunction would encourage interstate activity.  Ms. Jensen does not challenge any Maryland restriction on cannabis crossing state lines.  Ms. Jensen does not challenge any Maryland law or regulation regarding the handling, taxing, regulation, etc. of cannabis.  This case is solely about Appellees prohibiting Ms. Jensen from entering the Application Program because she attended a college outside of Maryland.

Moreover, as the First Circuit discussed, preferring in-state residents for licensing does not support the Controlled Substances Act stop cannabis sales.  It merely reserves the majority of profits for state residents in violation of the dormant Commerce Clause.

As further evidence Appellees did not enact their unconstitutional program to discourage interstate activity, a person who went to college outside of Maryland may own up to 35% of a License. A person who attended a qualifying college in Maryland and moved out of state can own 100% of a License. Thus, Appellees' program does not stop interstate activity, it merely attempts to reserve 65% of the profits for state residents.

**C.**   ***Other Public Interests***

The District Court ignored the public interest in robust competition in the market. *See, Toigo*, 549 F. Supp. 3d at 996 ("The public interest is best served by the protection of [an applicant's] constitutional right to fully participate in the medical marijuana business in Missouri on the same footing as a Missouri resident, a right that is likely being violated by the State's durational residency requirement.").

The District Court improperly found—with no evidence, or even unsubstantiated argument by Appellees—that other applicants incurred costs for their applications and would face a burden. In fact, applicants had no costs except the application fee itself, which Appellees can refund.

Applicants were not required to lease a property for their business premises or incur other hard costs for their applications. Even if an applicant leased a property notwithstanding that it provided no advantage in the Lottery, "any such economic harm would be the result of these [cannabis license] applicants investing money

before obtaining a license, which they did at their own risk." *Lowe*, 544 F. Supp. 3d, at 816; *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984) ("Faced with such a conflict between the state's financial and administrative concerns on the one hand, and the risk of substantial constitutional harm to plaintiffs on the other, we have little difficulty concluding that the district judge did not err in finding that the balance of hardships tips decidedly in plaintiffs' favor.")

The District Court even acknowledged that applicants had no upfront cost, and that even if they did, the applicants knowingly bore such risk by incurring rent or similar costs before obtaining a License. (Order footnote 11, JA254.)

Yet the District Court, **based on the District Court's sua sponte pure speculation insufficient to decide Ms. Jensen's Motion for a Preliminary Injunction**, stated that other applicants "**may have**" incurred costs in completing the application itself. (*Id*.) The District Court provided no citation for that statement. Instead, the District Court repeated for a second time that unsophisticated applicants "**may very well have**" expended time and money on the application, again with no evidence. (*Id*.)

**The District Court provided no citation whatsoever for its bald speculation that applicants "may have" spent money on their applications.** Counsel's review of the record does not show any evidence of any applicant incurring costs to complete the application itself. In fact, counsel's review of the record does not

even show that Appellees ever made such an argument, even based on pure speculation. The District Court seems to have raised this sua sponte and decided it based on speculation.

The only discussion of costs counsel can find in the record is Appellees' declaration that Maryland spent $650,000 to have an accounting firm review the applications. (Declaration ¶ 26, JA120.) The ***District Court Order will allow Appellees to violate Ms. Jensen's constitutional rights, along with the constitutional rights of residents of 49 of the 50 states, because Appellees spent $650,000 on an application program they already knew was unconstitutional.*** The Fourth Circuit should not allow Appellees to buy Ms. Jensen's constitutional rights against her will, much less for such a trivial amount.

***Moreover, all or nearly all of the $650,000 Appellees spent for auditor work is reusable when Appellees revise the application program to make it constitutional.*** Thus Appellees (who are entirely responsible for the violation in the first place) will not lose any money. Appellees can cure the constitutional defect by allowing persons to apply who went to colleges outside of Maryland. In that case, Appellees can reuse the already-reviewed applications and reap the full benefit of the $650,000 of auditor.

Alternatively, Appellees can revise the definition of social equity to no longer rely on colleges, and instead proceed with only the two alternate definitions

for social equity.  In that case, Appellees can reuse all of the $650,000 work that relates to the two other definitions of social equity but not the college qualifier.

Thus, Appellees have—within their own power—the ability to mitigate their harms.  Ms. Jensen has no ability to mitigate the harm from Appellees' constitutional violation.

### D.  *Equitable Powers*

The District Court committed another error of law in concluding that it would not use its equitable powers to enforce the Constitution.  The District Court relied on *Original Investments, LLC v. Oklahoma*, 542 F. Supp. 3d 1230, 1234–35 (W.D. Okla. 2021).   That case is discussed above in Part II.D (minority jurisdiction).

## V.  The Court Should Order an Injunction Forthwith with No Injunction Bond

Where a plaintiff shows a likelihood of success in proving a constitutional violation, the Fourth Circuit should remand with instructions to the district court to enter a preliminary injunction "forthwith." *Eisenberg ex rel. Eisenberg v. Montgomery Cnty. Pub. Sch.*, 197 F.3d 123, 133 (4th Cir. 1999).

The Court should order the District Court to issue the preliminary injunction without a bond.  A district court has the discretion to determine that no injunction bond is required.  *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999); *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir.

2004); and *JTH Tax LLC v. Kukla*, No. 22-cv-01542, 2022 WL 1651074 (E.D.N.Y. Apr. 26, 2022).

A court will waive the bond requirement where the plaintiff brings an action that promotes the public's interest, such as this action to enforce the dormant Commerce Clause. Pharm. *Soc. of State of New York, Inc. v. New York State Dep't of Soc. Servs*., 50 F.3d 1168, 1174 (2d Cir. 1995).

The moving party's size and financial resources may also be considered in setting a reduced bond amount. *See, GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1211 (9th Cir. 2000).

Here, Ms. Jensen is an individual suing to vindicate her constitutional rights, along with the constitutional rights of residents of 49 of the 50 states, and her rights should not depend on her paying a bond.

## CONCLUSION

Ms. Jensen asks this Court to reverse the District Court and remand with instructions to grant a preliminary injunction.

DATED: May 14, 2024          JEFFREY M. JENSEN, PC


                             By:  ____/s/ Jeffrey M. Jensen____
                                   Jeffrey M. Jensen
                                   Attorney for Plaintiff and Appellant

65

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that, according to the word count provided by Microsoft Word, the body of the foregoing brief contains 12,967 words, exclusive of those parts excluded by Fed. R. App. P. 32(a)(7)(B)(iii), which is less than the 13,000 words permitted by Fed. R. App. P. 32(a)(7)(B).  The text of the brief is in 14-point Times New Roman, which is proportionately spaced.  *See* Fed. R. App. P. 32(a)(5)(6).


DATED: May 14, 2024         JEFFREY M. JENSEN, PC


By:     /s/ Jeffrey M. Jensen
          Jeffrey M. Jensen
          Attorney for Plaintiff and Appellant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 14, 2023, I caused the foregoing document entitled **Opening Brief for Appellant** to be filed with the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: May 14, 2024          JEFFREY M. JENSEN, PC


By:      /s/ Jeffrey M. Jensen
        Jeffrey M. Jensen
        Attorney for Plaintiff and Appellant